## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ROBYN D. WILLIAMS,<br><br>                    *Plaintiff*,<br><br>          v.<br><br>RED COATS, INC., et al.,<br><br>                    *Defendants*. | Civil Action No. 1:20-cv-00571 (CJN) |

## MEMORANDUM OPINION

Robyn D. Williams alleges that her former employer, Red Coats Inc., and supervisor, Deine Avila, violated her right to medical leave and discriminated against her on the basis of her disability and race.  Williams moves for summary judgment on her FMLA and D.C. FMLA claims, and Defendants move for summary judgment on all claims.  The Court grants Plaintiff's motion with respect to liability and denies it with respect to damages.  The Court denies Defendants' motion on all counts, including with respect to Avila's individual liability.

## I.      Background

Williams began working for Red Coats on July 21, 2014, as a janitor providing cleaning services.  Joint Stipulation ¶ 1.  She worked for Red Coats full-time during the day at Judiciary Center, under the supervision of co-Defendant Deine Avila.  *Id.* ¶ 2.  Red Coats has a contract with J Street Companies to provide cleaning services at the building, and one of the tenants is the U.S. Attorney's Office for the District of Columbia.

When Williams worked at Judiciary Center, there were a total of thirteen cleaners, of whom the majority were African-American, including Williams, and the minority were Hispanic.  Def. Exs. B at 51, E at 16–17.  Williams was a member of the Service Employees International Union,

Local 32BJ, and the Union had a Collective Bargaining agreement between the Union and the Washington Service Contractors Association which addresses the removal, discharge, and layoff of employees.  Def.  Ex. G.

In  November  2015,  Williams'  cardiologist  diagnosed  her  with  supraventricular tachycardia.  Joint Stipulation ¶ 3.  Related heart issues would occasionally restrict Williams' heart functioning, with negative impacts on her ability to walk, breathe, and work.  *Id.*  There is no dispute that Williams' heart problems constituted a "serious health condition" under the FMLA and the D.C. FMLA.  *Id.* ¶ 10.  Because of this condition, Williams was permitted to take 15–20-minute breaks during the day, sometimes in Avila's office.  Def. Ex. E.II at 103, 127–28.

In January 2019, the Building Manager for the client at Judiciary Center requested the cleaners be reassigned because the Building Manager believed the cleaners were too comfortable on their floors and were not cleaning well.  Def. Ex. E at 22, 38–40; Ex. C at 35.  Each cleaner rotated to the floor above unless an exception was made by the Building Manager.  Williams was reassigned from the top floor to the first floor, which had fewer offices, and she also split the cleaning of the second floor.  Williams had requested to stay on the upper floors, but she claims that while Avila took a Hispanic cleaner's special request to the Building Manager, Avila did not do so for Williams.  *See* Def. Ex. E.II at 127.

After the rotation, Williams was still not performing well.  She was counseled about her performance on January 10, 11, and 15, 2019.  Def. Exs. C at 119–22; Def. Ex. K.  Additional complaints were received about her performance in February 2019, and she was issued a written warning on February 19, 2019.  Def. Ex. L; Def. Ex. M; Def. Ex. N.  That same month, Williams was again reassigned, this time to the 8th floor.  Red Coats claims that it received additional complaints about her cleaning after this reassignment.  Def. Ex. E at 38–40, 99–101.

In March and April 2019, Williams had heart problems that required immediate medical care and forced her to take leave. Joint Stipulation ¶¶ 4, 11. She provided adequate notice to Defendants of her medical care and issues, and Red Coats approved FMLA leave for Williams for March 5, March 14–18, and March 20–April 16, 2019. *Id.* ¶¶ 4–5.

On April 11, 2019, the Building Manager requested Williams' removal from Judiciary Center due to complaints about her lack of performance. Def. Ex. O; Pl. Ex. 5. The instigating complaint from an employee of a tenant at Judiciary Square (the United States Attorney's Office) occurred on April 9, 2019—nearly three weeks into Williams' FMLA leave. Pl. Ex. 5. The complainant wrote in an email that "our division isn't cleaned consistently . . . Currently, staff has used the women's bathroom and only one soap pump was working and toilet paper was down to barely nothing. Our chief . . . had to request that her office be vacuumed after weeks of going without one."[1] *Id.* After being told that the regular cleaner was Williams and she was out sick, the complainant wrote that they "ha[d] been having the same issues when [Williams] has been working. One Deputy AUSA mentioned [Williams] is very talkative and that's also been an issue." Def. Ex. O; Pl. Ex 5. The Building Manager forwarded this complaint to Avila, stating "based on the emails below and the several other complaints aimed directly at Robyn's lack of performance here, we would like her replaced with another permanent cleaning staff." Avila forwarded the email chain to Red Coats' human resources department. Pl. Ex. 5.

Red Coats decided to remove Williams from the building. Pl. Ex. 2 at 108–11 (testimony of Red Coats' Corporate Designee that Avila and her regional supervisor, Carlos Fernandes, made the ultimate decision to remove Williams). Around this time, Red Coats discussed transferring

---

[1] Defendants' exhibits omitted the portion of this email thread containing this initial complaint. *Compare* Def. Ex. O *with* Pl. Ex. 5.

Williams to another location.  *See* Def. Ex. P (Email dated April 11, 2019 between Liliana McKay and Deine Avila).[2]  But no such transfer occurred.  Similar full-time day jobs with Red Coats are rare—most cleaning positions are part-time or night positions.  Def. Ex. C at 135–38, 160–66.

On April 17, 2019,[3] Williams showed up at Judiciary Square for work.  She brought a note from her doctor stating that she should be allowed a 15–20-minute break to rest if she experienced pain, but that she was otherwise able to return to work, and would have no restrictions within a week.  Pl. Ex. 6.  But Avila told Williams that she had been removed from her position at Judiciary Center because of complaints about her cleaning and because the doctor's note requested "light work," which Red Coats could not accommodate.  Def. Ex. E at 45.  Williams was sent home.  *Id.* at 45–46.

Williams received two letters from Red Coats dated April 17, 2019.  One letter stated that Williams was "no longer employed with Red Coats, Inc.," and that her last day was March 20, 2019.  Joint Stipulation ¶ 8.  The other letter approved Williams' FMLA leave, stating that the leave ran from March 22 until April 16, 2019, with a return date of April 17, 2019.  *Id.* ¶ 9.

Red Coats did not attempt to find Williams alternative employment until at least July 2019.  Def. Ex. C.II at 140–41.  The company eventually provided Williams with an alternative job opportunity almost four months later, on or around August 8, 2019.  Pl. Exs. 2, 11.[4]  But Williams turned this job down because it was an evening shift rather than a day shift and she would face

---

[2] Red Coats' corporate designee stated that, to the best of her knowledge, Red Coats began looking for a position for Williams in July or August. *See* Pl. Ex. 2 at 140.

[3] Avila stated in her deposition that at least some of the following events occurred on April 16, but Defendants' statement of undisputed facts notes that Williams returned to work on the 17.  *See also* Def. Ex. A at ¶ 6.

[4] Red Coats received a letter from Williams' lawyer that demanded her FMLA rights on August 5, 2019.

transportation difficulties.  Def. Ex. B.II at 92–93; *see* Pl. Ex. 11.  Three months after that, Red Coats offered Williams a full-time day position.  Williams communicated to her attorney that she was accepting the position, Pl. Ex. 15 ¶ 12, but when she showed up the next morning, she was turned away and told there was no position for her.  Pl. Exs. 15, 17.  Williams and her attorney then each contacted Red Coats' offices in an attempt to accept the position, but Red Coats' Corporate Compliance Manager said that because Williams' attorney did not communicate her acceptance or discuss a start date, they had been taken by surprise when she showed up at the building.  Pl. Ex. 17.

Williams asserts that, throughout this time, she had been diligent in seeking alternative work.  Pl. Ex. 12 at 79–81; *see* Pl. Ex. 30.  She has handwritten notes supporting this assertion, Pl. Ex. 30, but she also concedes she did not submit job applications or work with a staffing agency.  Def. Ex. B.II at 99–100, 104–05.

On February 26, 2020, Williams filed this suit, asserting five claims, each against both Defendants.  Williams alleges violations of the Federal and D.C. Family Medical Leave Act First, race discrimination in violation of 42 U.S.C. § 1981 and D.C. Human Rights Act, and disability discrimination in violation of the D.C. Human Rights Act.  Compl. ¶¶ 7–17.

On August 17, 2020, all parties entered into a joint stipulation.  The stipulation stated, *inter alia*, "Since the parties stipulate to the points of fact set forth below, the only dispute remaining at issue in this matter is Plaintiff's damages."  Joint Stipulation at 1.

Defendants move for summary judgment on all five claims.  Williams moves for summary judgment on Claims One and Two—the Federal and D.C. FMLA claims.

## II.    Legal Standard

A court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

5

P. 56(a). A dispute about a material fact is not "genuine" unless "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the moving party has met its burden, the nonmoving party must then set forth "specific facts showing that there is a genuine issue for trial" to defeat the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Though the Court "may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (citation omitted), the nonmoving party must show more than "[t]he mere existence of a scintilla of evidence in support of" its position, *Anderson*, 477 U.S. at 252. In other words, "there must be evidence on which the jury could *reasonably* find for" the non-moving party. *Id.* (emphasis added).

"Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (quoting *Anderson*, 477 U.S. at 255). Yet "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Although "summary judgment must be approached with specific caution in discrimination cases, a plaintiff is not relieved of [her] obligation to support [her] allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Baylor v. Powell*, 459 F. Supp. 3d 47, 53 (D.D.C. 2020) (quotation omitted). As "conclusory allegations" and "unsubstantiated speculation" will not suffice to create genuine issues of material fact, "[s]ummary judgment for a defendant is most likely when a plaintiff's claim is supported solely by the plaintiff's own self-

serving, conclusory statements." *Bell v. E. River Fam. Strengthening Collaborative, Inc.*, 480 F. Supp. 3d. 143, 149 (D.D.C. 2020) (quotation omitted).

### III.    Analysis

### *Counts I and II:*
### *Federal and DC FMLA Claims*

Williams asserts in Count One that Defendants violated the Federal Family and Medical Leave Act, 29 U.S.C. § 2601 et seq., by functionally denying her leave by terminating her during her approved leave, and/or by retaliating against her for taking leave.  In Count Two, Williams makes the same assertions under the District of Columbia Family and Medical Leave Act.  D.C. Code § 32-501 et seq.

Both statutes provide employees with certain amounts of protected leave, provided they have a qualified medical reason.  29 U.S.C. § 2601 et seq.; D.C. Code § 32-501.  For this case's purposes, both statutes offer the same protections and prohibit the same conduct.  *See Teru Chang v. Inst. for Pub.-Private P'ships, Inc.*, 846 A.2d 318, 329 (D.C. 2004).  Both allow employees to take leave for "serious health conditions" and then be "restored to the same position which that employee held when the leave began, or to an equivalent position."  *Harrison v. Children's Nat'l Med. Ctr.*, 678 A.2d 572, 575 (D.C. 1996); D.C. Code § 32-505(d); 29 U.S.C. § 2614(a).  And both prohibit employers from interfering with leave under the Acts or from retaliating against those employees taking FMLA leave.  29 U.S.C. § 2615 (a)(2) (2000); D.C. Code § 32-507 (b)."  *Teru Chang v. Inst. for Pub.-Private P'ships, Inc.*, 846 A.2d 318, 328 (D.C. 2004).  For simplicity, the statutes are sometimes referred to collectively as the "FMLA."

### *Liability*

As to Defendants' liability on Counts One and Two, Williams moves for summary judgment on the basis of a joint stipulation in which Defendants conceded liability and stipulated

to facts sufficient for a finding of liability.  Williams also contends that Defendants violated both statutes when they granted her leave and then failed to restore Williams "to the position of employment held . . . when the family or medical leave commenced; or . . . to a position . . . that includes equivalent employment benefits, pay, seniority, and other terms and conditions of employment."  D.C. Code § 32-505(d); *see* 29 U.S.C. § 2614(a).

Remarkably, Defendants also move for summary judgment on these claims.  They argue that the stipulation did not concede liability.  And they argue that there was no interference with Williams' right to take leave because she was not denied leave and she was permitted to return to employment with Red Coats afterwards.  Defendants admit Williams "could not return to the same job location" but argue that was because the client requested her removal "due to Plaintiff's performance issues, which existed prior to Plaintiff taking FMLA leave."  Def. Mot. for Summ. J. at 23, ECF No. 11 ("Def. Mot."); *see* Def. Ex. C at 83, 87.

For two reasons, the Court agrees with Williams and grants summary judgment as to liability on Counts One and Two.

*First*, Defendants conceded liability on these claims.  In particular, in the Parties' August 17, 2020 Joint Stipulation, Defendants stipulated to various facts relating to these claims.  And, critically, in the introductory paragraph to the stipulations, the Parties agreed, "Since the parties stipulate to the points of fact set forth below, *the only dispute remaining at issue in this matter is Plaintiff's damages*."  Joint Stipulation at 1 (emphasis added).

Defendants fight this conclusion by arguing that Williams' proffering of the stipulation as a concession of liability is a "gotcha" attempt to pull one over on the Court.  Defendants' Opposition and Reply, at 2, ECF No. 18.  Defendants argue that they "have not conceded any violation of the FMLA laws" and vigorously contest their liability.  *Id.*

8

Defendants' argument is without merit.  Stipulations are interpreted based on their express text, though "like other contracts, [they] must be interpreted in light of the circumstances under which the agreement was made." *Nat'l Audubon Soc., Inc. v. Watt*, 678 F.2d 299, 307 (D.C. Cir. 1982).  Namely, disputed language should be interpreted in light of the interests of the parties at the time of the stipulation.  *Id.* (citing *Chouest v. A & P Boat Rentals, Inc.*, 472 F.2d 1026, 1029 (5th Cir. 1973)).

As noted above, the stipulations provide that because "the parties stipulate to the points of fact set forth below, the only dispute remaining at issue in this matter is Plaintiff's damages." Joint Stipulation at 1.[5]  This language makes complete sense, given the stipulated facts.  After all, Defendants stipulated to the fact that Williams was terminated during her approved FMLA leave—thereby essentially admitting a prima facie violation.  Joint Stipulation ¶¶ 5, 8.[6]

The context of the stipulation does not displace its plain meaning.  Red Coats—and its compliance officer—have repeatedly acknowledged their leave obligations to Williams.[7]  And such a concession certainly appears reasonable under the circumstances.  Such stipulations reduce

---

[5] The Court of Appeals has credited the substance of the preambles of stipulations.  *See, e.g.*, *Nat'l Audubon Soc., Inc. v. Watt*, 678 F.2d 299, 307 (D.C. Cir. 1982).

[6] Defendants assert that in earlier drafts of the joint stipulations, the language regarding liability was more explicit, but Defendants removed that language.  Defendants' Reply, ECF No. 18 at 2, n.1.  Even if this is true (and Defendants have provided no evidence it is), Defendants left language in the stipulation that has the same plain meaning, even if it does not contain the word "liability."

[7] Red Coats offered Williams two jobs in an attempt to mend the relationship.  Pl. Exs. 11, 17. And Red Coats' compliance officer forthrightly testified that the company prioritized finding Williams a comparable position because "we have an obligation, once we approve someone to go out on FMLA, to protect their jobs, and even if that means that person has been removed due to what we would normally do in any situation with a client . . . but that obligation remains with us, and that is to make sure that the person is employed."  Pl. Ex. 2 at 138; *see also* Pl. Ex. 21 (internal August 15, 2019 email from Crutchfield stating "we terminated Ms. Williams['] employment . . . this was a mistake. She was protected under FMLA and we have an obligation to employ her in a job.").

costs of discovery and litigation.  And Defendants were giving up, at best, a marginal defense to liability.

*Second*, the facts—both as stipulated and as beyond any genuine dispute in the record—are sufficient to grant summary judgment to Williams as to liability.  It is undisputed that Williams was granted leave and was prevented to return to work upon completing the leave.  Joint Stipulations at ¶¶ 5–9; Def. Ex. C at 39, 55–57; Pl. Ex. 3 at 40–41.  The parties quibble over whether this constituted a "termination" or a "layoff."  Whatever the terminology, the effect of Red Coats' actions is undisputed—Williams was given no opportunity to earn her hourly wage.  Pl. Ex. 19.  That was a straightforward violation of the requirement that anyone who takes leave under the FMLA "shall be entitled, on return from such leave—(A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment."  29 U.S.C. §2614(a)(1), *see also* D.C. Code § 32-505(d).[8]

---

[8] Williams also makes a strong showing that Defendants violated the anti-retaliation provisions of the FMLA.  *See* 29 C.F.R. § 825.220(c); *Thomas v. District of Columbia*, 227 F. Supp. 3d 88, 99 (D.D.C. 2016).  Williams demonstrates that Avila told Williams "she was taking too much time of work" and Avila wanted more "responsible" cleaners who showed up every day.  Pl. Ex. 3 at 31; Pl. Ex. 7.  These facts are sufficient to prevent summary judgment for Defendants, *see Teru Chang v. Inst. for Pub.-Private P'ships, Inc.*, 846 A.2d 318, 329 (D.C. 2004), but are not sufficient to foreclose a reasonable jury from finding that these statements were insufficiently linked to the removal.

Defendants contend that they should avoid liability because the Building Manager requested her removal while Williams was on leave.[9]  Defendants argue that this request was based on a complaint about Williams' cleaning that was made *before* she took her leave.[10]

As an initial matter, a request (or even a demand) from a client does not alleviate an employer's obligations under the FMLA.  Defendants cite no precedent or statutory provision to support such an exception.  And it has long been established that the preferences of clients and customers are no excuse for failing to comply with employment protections and nondiscrimination laws.  *See, e.g., Diaz v. Pan American Airways, Inc.*, 442 F.2d 385, 387 (5th Cir. 1971); *Fernandez v. Wynn Oil Co.*, 653 F.2d 1273, 1274 (9th Cir. 1981); *see also* 29 C.F.R. § 1604.2(a)(1)(iii) (prohibiting bona-fide occupational qualifications on the basis of client preferences).  Courts that have passed on the issue as it relates to the Federal FMLA have concluded that a client's request does not allow an employer to evade FMLA obligations nor does it otherwise "cleanse an employer's actions."  *Sparenberg v. Eagle All.*, 2015 WL 6122809, at *6 (D. Md. Oct. 15, 2015). This accords with the employment law principle that "the employer has the ultimate responsibility for providing a nondiscriminatory working environment—even when third parties are creating discriminatory conditions."  *Id.* (collecting cases).  Thus, even accepting Defendants' argument, the Court would still find for Williams.

---

[9] The request appears to have been made, at least in part, *because* Williams was on FMLA leave. But that's neither here nor there—Defendants' obligations do not change based on the requests of clients.

[10] While not cited by the Defendants, the argument appears to be based on 29 U.S.C. § 2614(a)(3)'s limitation that employees on FMLA leave do not have a right to be restored to a position "other than any . . . position to which the employee would have been entitled had the employee not taken the leave." *Id.*

In any event, the instigating complaint that led to the Building Manager's request arose from cleaning that occurred *while Williams was out on FMLA leave*.  The complainant said "our division isn't cleaned consistently . . . Currently, staff has used the women's bathroom and only one soap pump was working and toilet paper was down to barely nothing. Our chief . . . had to request that her office be vacuumed after weeks of going without one." Pl. Ex. 5.[11]  To be sure, the instigating complainant, after being told that the regular cleaner was Williams and that she was out sick, later noted that they "ha[d] been having the same issues when [Williams] has been working.  One Deputy AUSA mentioned [Williams] is very talkative and that's also been an issue." Def. Ex. O; Pl. Ex 5.  And Williams had indeed had several complaints and even formal warnings about her work in early 2019.  But Defendants have pointed to nothing in the record that suggests that Williams' performance before she went on leave was as bad as the performance of the cleaners who replaced her during her leave (assuming Red Coats had anyone replace her).  The record does not reasonably support the proposition that Williams would have been terminated before working more had she not gone on leave.

Red Coats also could have both complied with the Building Manager's request and its FMLA obligations.  It could have transferred Williams to another site, switching her with a day-time cleaner at another location.  And, if it came to it, Red Coats could have removed Williams but kept paying her wages until they found her a comparable or otherwise acceptable position.

Defendants present other variations on this argument, but none is compelling.  Defendants argue, for example, that Williams was never terminated but could return to employment with Red Coats after her leave ended, she just could not return to Judiciary Center because of the client's

---

[11] As noted above, Defendants' exhibits omitted the portion of this email thread containing this highly material initial complaint.  *Compare* Def. Ex. O *with* Pl. Ex. 5.

preference.  But prohibiting her return to the same or equivalent position is still a violation of 29

U.S.C. § 2614.  Defendants also argue that under the governing CBA, employees could be removed

from a location upon the request of a customer, provided there is a good faith reason to justify the

removal.  Def. Ex. G at 29.  But Defendants never contend that the CBA displaces the FMLA

obligations (and it appears they could not, given they granted Williams FMLA leave).  And while

Defendants note that Williams never contacted the Union or followed the handbook regarding

employment disputes, they don't claim that Williams somehow waived her FMLA rights by failing

to do so.

        For these and other reasons, the Court grants Williams' motion for summary judgment as

to liability on Counts One and Two and denies Defendants' motion for summary judgment on the

same Counts.[12]

*Damages*

        Williams asserts that summary judgment is also appropriate with respect to her damages

on her FMLA claims.  She contends that it is beyond genuine dispute that she is owed her full

wage as if she had worked full time for Red Coats from April 17, 2019, until she is reinstated at

Red Coats or finds a similar job—plus interest and liquidated damages.  She contends that Red

---

[12] The Court similarly denies Defendants' motion for summary judgment as to Avila's individual liability on the FMLA claims.  As noted above, Avila stipulated to liability.  And there's a good argument she would be liable under the FMLA anyway.  Individual liability exists for "any person who acts, directly or indirectly, in the interest of an employer" and thereby controls the aspect of employment alleged to be violated.  29 U.S.C. § 2611(4)(A)(ii)(I); *see Freemon v. Foley*, 911 F.Supp. 326, 330–31 (N.D.Ill.1995) (citing *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 966 (6th Cir.1991) (analyzing a similar definition of "employer" in the FLSA to find individual liability) (superseded on other grounds)); *see also Bryant v. Delbar Products, Inc.*, 18 F.Supp. 2d. 799, 808 (M.D. Tenn. 1988).  Williams has provided sufficient evidence for a reasonable jury to conclude that Avila did have decisionmaking authority over Williams' employment with Red Coats or, at least, her removal from Judiciary Center.  *See* Pl. Ex. 2 at 109–11; Pl. Ex. 4 at 75–78, 121.

Coats never offered her any other position until August 8, 2019, and that the only comparable position Red Coats offered was withdrawn before she started—apparently because of a communication mishap.  Defendants respond that there are material facts in dispute as to whether front pay is appropriate and to what degree Williams mitigated her damages.

The Court agrees with Defendants.  A plaintiff may be awarded compensation in order to make her whole after an unlawful discharge.  *See Cline v. Wal-Mart Stores, Inc.,* 144 F.3d 294, 307 (4th Cir.1998); *see also Bartek v. Urban Redevelopment Authority of Pittsburgh*, 882 F.2d 739, 746 (3d Cir. 1989).  But such compensation should not be punitive or create a windfall for the employee.  *Dotson v. Pfizer, Inc.,* 558 F.3d 284, 300 (4th Cir. 2009) (citing *Duke v. Uniroyal,* 928 F.2d 1413, 1424 (4th Cir.1991)).  Here, a damages award will need to take into consideration whether Williams would have continued to work for Red Coats had she not been laid off, and the extent to which Williams did or could have mitigated her damages.

Williams has not demonstrated that there is no material dispute about these issues.  The record does not establish the amount of time she would have wanted to work for Red Coats had she not been terminated or laid off, or how long she could have continued in the job given negative reviews of her cleaning.  At least some record evidence suggests the client had serious issues with Williams' performance.  *See* Def. Ex. M.  And there is little information before the Court regarding the availability of similar jobs and the time needed for Williams to find substitute work.  *See Peyton v. DiMario*, 287 F.3d 1121, 1128–30 (D.C. Cir. 2002); *Barbour v. Merrill*, 48 F.3d 1270, 1279 (D.C. Cir. 1995); *Jean-Baptiste v. D.C.*, 958 F. Supp. 2d 37, 42 (D.D.C. 2013).  To be sure, Williams has testified to her diligence in seeking alternative work and has handwritten notes supporting her claims, but she also concedes she did not submit job applications or work with a staffing agency.  Def. Ex. B.II at 99–100, 105.  A reasonable jury could discredit Williams'

testimony or find her efforts insufficient.  And there is also the question of whether or how the coronavirus pandemic should affect the damages calculation.

The Court therefore denies Williams' motion for summary judgment as to the damages to which she is entitled on her FMLA claims.

### Counts III and IV:
### 42 U.S.C. § 1981 and DC HRA Race-Discrimination Claims

Williams asserts two claims of race discrimination.  Count Three alleges that her termination and discrimination in assignments and compensation violates 42 U.S.C. § 1981, and Count Four alleges the same conduct violated the D.C. Human Rights Act, D.C. Code § 2-1401.01 et seq.

Defendants move for summary judgment, asserting there is no direct evidence of race discrimination, and that under the McDonnell-Douglas framework, Williams did not suffer an adverse employment action.  Williams opposes summary judgment, arguing that a genuine dispute of material fact exists as to whether Avila was motivated by racial bias in assigning Williams to the 1st floor and barring her from post-FMLA employment.

Both Section 1981 and the D.C. Human Rights Act bar discrimination on the basis of race. 42 U.S.C. §1981; D.C. Code § 2-1401.01 et seq.  Section 1981 prohibits adverse contractual actions (including employment actions) that would not have occurred *but-for* racial animus.[13]  *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020).  The D.C. Human Rights Act prohibits adverse employment actions in which racial animus is a *motivating factor.  See Furline v. Morrison*, 953 A.2d 344, 353 (D.C. 2008).  Under either statute, the Plaintiff

---

[13] Section 1981 states that "All persons within the Jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." Although Williams alleges she is treated worse than her Hispanic co-workers, Courts have applied Section 1981 as a general requirement not to discriminate on the basis of race.

must establish a prima facie case that: "(1) she belongs to a protected class; (2) that she was qualified for the job from which she was terminated; (3) that her termination occurred despite her employment qualifications; (4) and that her termination was based on the characteristic that placed her in the protected class." *McManus v. MCI Commc'ns. Corp.*, 748 A.2d 949, 954 (D.C. 2000) (quoting *Blackman v. Visiting Nurses Ass'n*, 694 A.2d 865, 868–89 (D.C. 1997)).

Absent direct evidence of discrimination, these discrimination claims are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See McManus*, 748 A.2d at 954 (applying the same standard under the D.C. HRA); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (clarifying that where a plaintiff produces direct evidence, she "may prevail without proving all the elements of a prima facie case"). Once a plaintiff establishes a *prima facie* case of discrimination, the burden then shifts to the employer to articulate some legitimate, non-discriminatory or non-retaliatory reason on which it relied in taking the complained-of action. *McDonnell Douglas*, 411 U.S. at 802. This burden is "one of production" in which an employer must produce evidence "sufficient for the trier of fact to conclude" that the action was taken for the provided reason. *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 854 (D.C. Cir. 2006); *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981) (noting that an employer's explanation for the challenged action must be "clear and reasonably specific"). Some factors used to decide whether the employer has satisfied its burden to articulate a legitimate nondiscriminatory reason for the action taken include whether (1) the employer produced "evidence that a factfinder may consider [at summary judgment];" (2) "the factfinder, if it believed the evidence, [could reasonably] find that the employer's action was motivated by a nondiscriminatory reason;" (3) the nondiscriminatory reason is "facially credible in light of the proffered evidence;" and (4) the evidence presents "a clear and reasonably specific

16

explanation as to how the employer[] applied [its] standards to the employee's particular circumstances." *Figueroa v. Pompeo*, 923 F.3d 1078, 1087 (D.C. Cir. 2019).

When the employer proffers a clear and specific reason, the "central question" at summary judgment becomes whether the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted rationale is pretextual. *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (citing *St. Mary's*, 509 U.S. at 507–08, 511)). Whether evidence proffered to show pretext suffices to raise an inference of unlawful discrimination or retaliation is a fact-sensitive inquiry. *See Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998); *Walker v. Johnson*, 798 F.3d 1085, 1091–92 (D.C. Cir. 2015) (identifying the following factors that may support an inference of pretext: the employer's (1) preferential treatment of similarly situated employees outside the plaintiff's protected group; (2) inconsistent or dishonest explanations; (3) deviation from established procedures or criteria; (4) pattern of poor treatment of other employees within the same protected group as the plaintiff; (5) the temporal proximity between an employee's protected activity and the employer's adverse action; and (6) other relevant evidence that a jury could consider to reasonably conclude the employer acted with an illicit motive).

To begin, the floor reassignments and most of the behavior Williams insinuates were racially motivated were not "adverse employment actions." Williams must demonstrate "a significant change in employment status such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009) (internal citations and quotations omitted). In other words, Williams must have "experience[d] materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities

such that a reasonable trier of fact could find objectively tangible harm." *Forkkio v. Powell,* 306 F.3d 1127, 1131 (D.C. Cir. 2002). "Mere idiosyncrasies of personal preference" and "[p]urely subjective injuries, such as dissatisfaction with a reassignment, or public humiliation or loss of reputation" are all insufficient. *Id.* at 1130–31.[14]

Even if they all occurred as Williams asserts, different meetings for Spanish- and English-speaking employees, subjectively worse assignments, prioritization for cleaning supplies, or somewhat harsher critiques of one's work, do not, without more, rise to the level of an adverse employment action. *See* B.II at 61–67; Pl. Ex. 26. And for most of these actions, Williams does not argue as much. *See* Pl. Opp. To Def. Mot. at 13–16. As for her reassignment to the first floor, that reassignment was not a materially adverse action. To be sure, Williams asserts that the first floor was the busiest in the building, while Defendants note that it had the fewest offices to clean. But even crediting Williams on this question, this was a mere reassignment of job responsibilities, and she has not shown that it materially affected her conditions of employment or other employment opportunities.[15]

More consequential is Williams' removal. Defendants first argue that they are not responsible for the dismissal because it was requested by the Building Manager. Not so. As noted above, employers are not free to discriminate in order to satisfy their customers. *See Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 477 (11th Cir.1999) (finding a defendant liable under 42 U.S.C.

---

[14] D.C. Courts apply a similar threshold to D.C. HRA claims. *See Barrett v. Covington & Burling LLP*, 979 A.2d 1239, 1251 (D.C. 2009) (requiring materially adverse consequences or objectively tangible harm).

[15] The Court of Appeals is currently reconsidering whether forced lateral transfers must have "objectively tangible harm" to constitute an adverse employment action. *Chambers v. D.C.*, No. 19-7098, 2021 WL 1784792, at *1 (D.C. Cir. May 5, 2021) (granting en banc review to reconsider *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999)). While Williams' suit involves a reassignment rather than a transfer, the applicable standards on this issue may soon be in flux.

§ 1981 for intentionally matching the races of callers and employees when callers requested a racial match); *Freeman v. Dal–Tile Corp.*, 750 F.3d 413, 422 (4th Cir.2014) (stating an employer can be held liable for discrimination for third-party actions).

Defendants next contend that Williams was not terminated, but was rather placed on a layoff list and, consistent with the CBA, would have first pick of similar positions when Red Coats had openings.  Maybe so, but it's undisputed that Williams was removed from her job and not paid.  That plainly constitutes an adverse employment action.  (Surely Red Coats could not have taken this action just because Williams is African-American.[16])

Defendants eventually get around to the argument that the record lacks any evidence that they took these actions because Williams is African-American.  And here Defendants stand on somewhat firmer ground.  Terminating (or laying off) one of seven African-American employees in the middle of her FMLA leave does not, without more, raise an inference of *race* discrimination.

But Williams has proffered other evidence giving rise to an inference of race discrimination.  Her testimony is inconsistent on these points, but viewed in the light most favorable to her, she has explained that Avila gave special preference to several Hispanic employees in selecting their assigned floor while denying Williams' similar request.  Pl. Ex. 29 at 60–65.  She also asserts Avila would criticize her work ethic in a disrespectful manner, and not do the same for Hispanic employees, Pl. Ex. 26 ¶ 8; would hold separate team meetings for Hispanic and Black employees, Pl. Ex. 29 at 60–61; allowed Hispanic employees access to certain cleaning supplies, while denying the same privileges to Williams, Pl. Ex. 26 ¶¶ 6–7 (clarifying two

---

[16] Defendants imply that the CBA permitted shifting Williams to the layoff list.  But, even if one could contract around nondiscrimination laws, the CBA does not do so.  It just describes the process that Red Coats had to undertake in the event an employee were removed at the request of a client—it does not authorize such removals.

apparently inconsistent answers during deposition, *compare* Def. Ex. B at 71 *with* Pl. Ex. 29 at 56–57), and favored Spanish-speaking Hispanic employees over Black employees, even paying Williams less for the same work.  Pl. Ex. 26 ¶¶ 11–12.  While Defendants dispute these contentions or have reasonable explanations for them, a reasonable jury could draw an inference of racial discrimination.  *See Allison v. Wash. Metro. Area Transit Auth.*, 284 F. Supp. 3d 3 (D.D.C. 2018).[17] Thus, Williams has made a prima facie case.

Defendants offer two clear and specific explanations for why they laid Williams off.  *See Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).  They argue first that the Building Manager requested her removal from the building.  But this does not tell the full story because, as noted above, the instigating complaint originated from poor cleaning that occurred while Williams was out on FMLA leave.  *See Walker*, 798 F.3d at 1091–92 (noting an inference of pretext can be drawn from deviations from established procedures or dishonest explanations).

And Defendants' second explanation for terminating or laying off Williams—that her doctor limited her to "light duty" and Red Coats could not accommodate—could reasonably be interpreted as dishonest or at least inconsistent.  *See id.* (noting inconsistent or dishonest explanations can lead to an inference of pretext).  The note from Williams' doctor simply requested

---

[17] Defendants argue that it is "well-settled law that when an employee fails to follow an employer's established procedure for reporting discrimination, the employer may not be held liable."  Def. Mot. at 19 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Curry v. District of Columbia*, 195 F.3d 654 (D.C. Cir. 1999)).  Not quite.  It is well-settled that employers facing vicarious liability for discrimination claims have an affirmative defense of reasonableness.  Here, Defendants relied on Williams' sworn testimony to assert she had not reported the alleged discriminatory conduct to Red Coats or to the Union.  *See* Def. Ex. B at 78–79 ("We had a union and I did try to get in contact with the union because of the things that was going on.  I never could get in contact with them.").  In an affidavit attached to her reply to Defendants' Motion for Summary Judgment, Williams clarifies she did strenuously try to report Avila's conduct to the Union, who didn't respond, and to Red Coats human resources, who just told her to speak with Avila.  Pl. Ex. 26 ¶¶ 13-14.  And, in any event, Avila was her supervisor.  *See Curry v. District of Columbia*, 195 F.3d 654, 660 (D.C. Cir. 1999).

the same accommodation that Defendants had previously permitted her—15–20-minute breaks when needed—and only for her first week back.  Pl. Exs. 4, 6.  This inconsistency is the sort of evidence from which a reasonable jury could infer pretext.  *See Walker*, 798 F.3d at 1091–92. *See id.* (noting inconsistent or dishonest explanations can lead to an inference of pretext).

The clearest inference from the record—by far—is that Williams was laid off because she did not have a great record regarding cleaning in combination with the fact she went out on leave, but not because of her race.  As discussed above, the evidence is strong and the record is clear that the Building Manager requested her removal from Judiciary Center while Williams was out on leave and Red Coats decided to comply with that request by doing so.  In contrast, the record is, at best, vague and inconsistent with regards to race discrimination.[18]

Nonetheless, Defendants' explanations of why they laid off Williams leave a logical gap. Had Defendants straightforwardly argued that they fired Williams in part because she went on FMLA leave, then that gap could very well be closed in such a way that a jury could not reasonably infer race discrimination (or, put differently, that a jury could not reasonably conclude that

---

[18] For example, when asked whether Avila made any discriminatory statements towards her, Williams testified "when I was going through my episodes of my dizziness . . . I came downstairs so I could sit down and then she told me [it] looks like I was drinking, you know, different things," and that she was "taking too much time." Def. Ex. 29 at 60.  Williams has not shown any other African-Americans were treated this way and thus the strongest inference seems to be that the comments were made in relation to her disability, not her race.  And even according to Williams' testimony concerning the separate staff meetings based on race, she admits that some of the Hispanic cleaners did not know English, and separate language meetings does not give rise to an inference of race discrimination.  *Id.* at 61.  And Williams' testimony regarding employee requests being met based on race is inconsistent.  *See* Pl. Ex. B at 70–71 (Williams testifying she did not know of other African-American employees that Avila mistreated); Def. Ex. 29 at 56–57 (Williams testifying other African-American cleaners similarly had trouble having their requests catered to); *see also* Pl. Ex. 26 (Williams' affidavit explaining the inconsistency).  Williams also argues that the relevant floor reassignments were made on the basis of race, but this is at best speculative because Avila did not testify concerning the reassignments about which Williams is complaining. *See* Def. Ex. E.II at 62 (Avila's testimony); Def. Ex. Z; Def. Ex. AA; Def. SDF ¶ 81.

Defendants' proffered justifications were pretextual).  But Defendants have not offered that explanation, and the Court will not make it for them.

The Court denies Defendants' motion for summary judgment as to the race-discrimination claims.[19]

### Count V:
### DC HRA Disability-Discrimination Claim

In Count Five, Williams alleges she was disabled under the D.C. Human Rights Act, D.C. Code § 2-1401.01 et seq., and Defendants terminated her, discriminated against her in assignments and compensation, and failed to accommodate her as required under the Act.

Defendants argue that Williams cannot prove she suffered an adverse employment action on account of her disability.  Def. Mot. at 21.  Defendants reiterate their position that Williams' poor performance resulted in the client's request to remove her to which Red Coats simply complied, *see id.* at 21–22; Def. Ex. O; and they add that Defendants never failed to accommodate Williams' medical needs.  *See* Ex. E.II at 103, 127–28.  Williams disagrees because removing her on the basis of the client's complaint was itself discriminatory under these circumstances, and the Defendants' other grounds for dismissal—her inability to do full work—was plainly pretextual.

---

[19] Defendants have also not met their burden with respect to Avila's individual liability as to race discrimination.  Liability exists for those individuals involved in discriminatory activity that violates 42 U.S.C. § 1981, *see Brown v. Children's Nat. Med. Ctr.*, 773 F. Supp. 2d 125, 135–36 (D.D.C. 2011), or violates the D.C. HRA, see *id.* at 136 (*citing Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 888 (D.C. 1998)); *Purcell v. Thomas*, 928 A.2d 699, 714–15 (D.C. 2007); D.C. Code § 2–1401.02(10) (defining "employer" to include "any person acting in the interest of such employer, directly or indirectly.").  Williams has demonstrated that there is, at least, a genuine dispute of material fact as to the extent of Avila's involvement in the discriminatory activity she alleges.  Namely, Avila is the one Williams asserts made discriminatory statements, held segregated meetings, and generally gave preferential treatment to Hispanic employees.  *See* B.II at 61–67; Pl. Ex. 26.  Furthermore, Williams provides evidence that Avila was instrumental in the decisionmaking process that led to Williams' removal from Judiciary Center.  *See* Pl. Ex. 2 at 109–11; Pl. Ex. 4 at 75–78, 121.

Pl. Opp. To Def. Mot. at 16–18.  The Court agrees with Williams that Defendants have not met the standard for summary judgment.

The D.C. Human Rights Act provides a similar framework for analyzing disability-discrimination claims as it does race-discrimination claims.  The Plaintiff must establish a prima facie case that: (1) she was disabled under the D.C. HRA; (2) she was qualified for her position, with or without a reasonable accommodation; and (3) the employer took an adverse employment action against Plaintiff due to her disability.  *See Barrett v. Covington & Burling LLP*, 979 A.2d 1239, 1250–51 (D.C. 2009); *Carroll v. England*, 321 F. Supp.2d 58, 69 (D.D.C. 2004).  As with race-discrimination, the D.C. HRA applies the McDonell Douglas framework.

Here, Williams provides some direct evidence of discrimination because Avila made comments that a reasonable jury could find to reflect a discriminatory motive.  *See Teru Chang v. Inst. for Pub.-Private P'ships, Inc.*, 846 A.2d 318, 329 (D.C. 2004).  Namely, Avila told Williams "she was taking too much time off work."  Pl. Ex. 3 at 31 ("Q: Ms. Avila, do you remember Ms. Williams taking a lot of leave in early 2019?  A: Yes.  Q: And do you remember telling her that she was taking too much time off work?  A: Yes. Q: Why did you tell her that?  A: Because we are a cleaning company, and we are supposed to go [to work] daily.").  And Avila emailed Red Coats management complaining that Williams missed a lot of days and stating "I need employees to come to work and be responsible."  Pl. Ex. 7.

For the same reasons discussed above, Defendants cannot simply rely on the customer's request to remove Williams from Judiciary Center as the basis for laying her off.  And Defendants' second stated reason for laying off Williams—that she was only cleared for "light duty" and Red Coats could not accommodate that—can reasonably be interpreted to be pretextual.  Defendants assert that the doctor's note Williams provided on April 17th, 2019 stated that she was restricted to

"light duty" and that Red Coats could not accept that. Pl. Ex. 4 at 78. But the doctor's note states that, during the week she returned to work (April 15 to 19, 2019), if "she is in pain from her procedure then she should be allowed a 15–20 minute break to rest. She may resume back to normal work activity without restrictions on 4/20/19." Pl. Ex 6, ECF No. 12-1. This is the same accommodation that Defendants had already been making for Williams prior to her surgery. Pl. Ex. 4 at 127–28. At a minimum, this inconsistency as to what Red Coats would or would not accept as an accommodation for its cleaners is sufficient to prevent summary judgment for Defendants.

The Court denies summary judgment to the Defendants with respect to Count Five.[20]

## IV.    Conclusion

For at least these reasons, the Court grants in part and denies in part Williams' motion for summary judgment, and the Court denies Defendants' motion for summary judgment. An Order will issue contemporaneously with this Opinion.

DATE:  September 30, 2021

CARL J. NICHOLS
United States District Judge

---

[20] Defendants have not met their burden regarding Avila's individual liability on disability discrimination. The same standard for individual liability applies as with race discrimination under the D.C. HRA. Williams has shown that there exists a genuine dispute of fact as to Avila's involvement in disability-discrimination. Williams asserts that Avila told her she was taking "too much time off work," Pl. Ex. 3, and then, as noted, Williams provides evidence that Avila was part of the decisionmaking process that resulted in Williams' removal. In addition, Avila interpreted the note from Williams' doctor to mandate "light work," and provided that as an additional reason to refuse Williams work at Judiciary Center. Pl. Ex. 4 at 78; *but see* Pl. Ex. 6 (Doctor's Note). A reasonable jury could find Avila sufficiently connected to disability discrimination to be individually liable.